IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ELMER CRABB and DEBRA CRABB,<br><br>Plaintiffs,<br><br><br><br><br><br>vs.<br><br><br>STATE FARM FIRE AND CASUALTY COMPANY and JOHN DOES I-X, inclusive,<br><br>Defendants. | ORDER GRANTING DEFENDANT'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT, TO STRIKE PLAINTIFF'S AFFIDAVIT, AND TO DISMISS PUNITIVE DAMAGES CLAIMS<br><br><br><br>Case No. 2:04-CV-00454 PGC |

In this first-party insurance case brought by plaintiffs Elmer and Debra Crabb, defendant State Farm moves for summary judgment on various grounds. After reviewing the briefs and hearing argument, the court GRANTS State Farm's motion to exclude Nathanael Cook and motion to strike the affidavit of Mr. Cook filed by the Crabbs (#70), GRANTS State Farm's motion for partial summary judgment regarding the Crabbs' claim for ordinance or law coverage (#52), GRANTS State Farm's motion to dismiss the Crabbs' punitive damages claims (#62), DENIES AS MOOT State Farm's motion for extension of time regarding the settlement conference deadline (#71), GRANTS State Farm's motion for partial summary judgment

regarding the Crabbs' claim of breach of implied covenant of good faith and fair dealing (#76), and GRANTS State Farm's motion for summary judgment regarding collateral estoppel and material misrepresentation (#75).  The court also DENIES AS MOOT State Farm's objection to the Crabbs' Notice of Compliance (#93).   In light of these rulings, none of the Crabbs' claims survive and the court therefore orders the Clerk's Office to close this case.

## BACKGROUND

On August 27, 2000, the Crabbs' house suffered extensive fire damage.  The Crabbs then filed insurance claims under their homeowner's insurance policy with State Farm.  Within a day of the fire, State Farm met with the Crabbs to explain the claims process.  State Farm indicated in its form letter that if the Crabbs intended on rebuilding their home, they would need to prepare a cost estimate.  The letter also indicated that if the Crabbs did not rebuild, they would receive the actual cash value of the home, that is, the replacement cost of the home less reasonable age-based and condition-based depreciation.  Additionally, if the Crabbs chose to rebuild the home, State Farm stated they would make an initial payment based on the actual cash value, and that full replacement cost would be paid upon completion of the rebuild.

State Farm paid $302,836.29 on November 1, 2000, but it is disputed whether this was for the actual cash value, or the replacement cost of the home.  Indeed, at the time the Crabbs had listed the home for sale by a real estate agent, the asking price was $139,000.  The Crabbs' estimate from a licensed contractor, however, indicates that the cost to repair the damage to the home was $665,951.78.  The Crabbs never rebuilt their home, and received a total of $312,240, which was the Policy limit under coverage A for loss to the damaged portion of their dwelling.

The Crabbs also claimed certain personal property had been damaged during the fire.

After the fire, State Farm indicated to the Crabbs that they needed to fill out inventory forms to process their personal property claim.  State Farm made an advance personal property payment of $5,000 at that time.  Besides the $5,000 advance payment made by State Farm on August 28, 2000, State Farm also made a number of other payments to the Crabbs for personal property.  These included $9,073.47 on September 13, 2000, $7,004.15 on September 14, 2000, $1,753.09 on September 18, 2000, $1,602.97 on September 20, 2000, and more than $2,500 on September 25, 2000.

The contract also stated that the Crabbs had to "prepare an inventory of damaged or stolen personal property, [and show] in detail the quantity, description, age, replacement cost and amount of loss.  Attach to the inventory all bills, receipts and related documents that substantiate the figures in the inventory."[1]  The policy also required within 60 days of loss a signed, sworn proof of loss which set forth the inventory.[2]  State Farm indicated to the Crabbs, however, that there was a two-year period from the date of loss to make a claim for replacement cost benefits.  Under the policy, State Farm would pay the Crabbs for the Actual Cash Value of their personal property, but nevertheless should document their purchases to receive this replacement cost benefits when the item was replaced and documented with receipts.

In early November 2000, the Crabbs submitted a personal property inventory form to State Farm which identified a number of items lost or damaged, but omitted information regarding the date of purchase and age of these items.  State Farm returned the inventory list

---

[1]State Farm's Memo. in Support of Sum. Judg. on the Crabbs' Claims for Ordinance and Law Coverage, Docket No. 53, Ex. 1 at sec. I, Conditions (2(c)) at 13 ("State Farm Policy") (Sept. 28, 2005).

[2]*Id*. at 2(e).

indicating that it needed additional information on these items, including the location and date of purchase, and documentation relating to the personal property.  State Farm then sent several follow up letters until January 12, 2001.

Many months later, the Crabbs, through their adjuster Nathanael Cook, submitted a partial inventory of personal property damaged in the fire on June 5, 2001.  State Farm responded, indicating that it had paid $27,835.85 in personal property payments, and that the inventory submitted by Mr. Cook was still deficient.  State Farm stated that the policy required an inventory showing "in detail the quantity, description, age, replacement cost, and amount of loss, [including] all bill, receipts and related documents that substantiate the figures in the inventory."  The Crabbs allege that Mr. Cook then immediately sent a fax to State Farm concerning the property on July 25, 2001, citing to Exhibit F of their Opposition Memorandum.[3]  In fact, this fax was sent on July 25, 2002, over a year later.[4]  Thus, the Crabbs failed to respond to State Farm's further request, and State Farm sent Mr. Cook three more letters by December 7, 2001.  State Farm finally indicated it had been 16 months since the fire, and that such time appeared to be more than adequate to provide the requested information to State Farm.  It indicated that unless Mr. Cook provided the requested information within three weeks, it would assume that the Crabbs were not pursuing the matter further.

On July 25, 2002, the Crabbs sent another inventory, identifying 994 items totaling $74,966 in value that had been destroyed by the fire.  The inventory, submitted through Mr.

---

[3]The Crabbs' Memo. in Opp. regarding Breach of Good Faith and Fair Dealing, Docket No. 88, Ex. F (Dec. 16, 2005).

[4]*Id.* (dated July 25, 2002, and stamped received on July 30, 2002).

Cook, indicated the quantity and replacement cost value of the 994 items, but did not indicate the age, nor included any bills, receipts, or related documents to substantiate the figures in the inventory.  He advised State Farm that the Crabbs had more personal property lost in the fire and that he would be supplementing the inventory further.  State Farm again reminded Mr. Cook of the requirements of the policy and that a complete inventory needed to be provided along with supporting documentation.

Less than three months later, the Crabbs submitted an updated personal property inventory with a "few items added to the list" totaling 1318 items and $195,981 in value.[5]  This list included items such as 200 pairs of ladies shoes with a value of almost $16,000,[6] 62 ladies dresses with a value of almost $5,000,[7] 22 pairs of ladies wool skirts and suit jackets valued at over $8,500,[8] two convertible pram baby strollers valued at $3,000,[9] a Bekins PC computer fan valued at $3,500,[10] and miscellaneous food in the pantry and freezer valued at $4,200.[11]

Given the discrepancies discovered during State Farm's investigation of the Crabbs' claim, State Farm informed the Crabbs that it might be necessary to schedule an examination under oath so they could resolve some questions.  Four-and-a-half months later, State Farm held

---

[5]State Farm Memo. in Support of Sum. Judg. on Plaintiff's Second Claim, Docket No. 78, Ex. C, at 28-50 (Nov. 15, 2005) (Crabb Amended Inventory List).

[6]*Id*. at 46.

[7]*Id*.

[8]*Id*.

[9]*Id*.

[10]*Id*. at 28.

[11]*Id*. at 49.

an examination under oath with Mrs. Crabb.  When asked about the dramatic increase of items

from 994 to 1318, and the substantial increase in value to over $195,000 of personal property,

Mrs. Crabb indicated that it was an on-going process.  She also indicated that she "went through

all the paperwork [she] had, all of the notes [she] had taken, all of the inventories, did away with

the duplicates, [and] added the things that were not there."[12]  When asked about this paperwork,

she indicated that she did not know where it might be, that she might have gotten rid of it, and

that she would have to sort through her paperwork at home.[13]  Up to this point, she has failed to

provide anything but scant documentation to explain the substantial increases in items and value

of their personal property claim.

The Crabbs also submitted a theft claim for items stolen from their garage following the

fire, including tools, a tiller, and a mechanic's host.  In a police report, the value of the tiller and

the mechanic's hoist was totaled by some unknown person at $200 a piece.  Mr. Crabb

represented to State Farm that the value of these items was considerably greater, but failed to

provide any information documenting ownership and the value of these items.  Indeed, Mr.

Crabb indicated that he thought he paid more than $2,000 for the tiller, and between $900-$1000

for the hoist, but provided no documentation regarding these claims.  Mr. Crabb then submitted

to an examination under oath regarding the theft claim, and indicated during that examination

that he "didn't pay $2,000 for the tiller," and that he did not remember how much he paid for it,

---

[12]State Farm Memo. on Plaintiff's Second Claim, Docket No. 78, Ex. H (Debra Crabb
Examination Under Oath).

[13]*Id.*

"but it was a lot less than that."[14]

In order to substantiate Mr. Crabbs' theft claim, State Farm obtained a copy of the Crabbs' recent bankruptcy filings.  The Crabbs filed for Chapter 13 bankruptcy prior to the August 2000 house fire, and in their 1997 and 1998 bankruptcy documents the Crabbs listed their personal property and its value.  The documents failed to list any of the items the Crabbs indicated had been stolen from their shed.  Both of the Crabbs stated that they did not list the tools because the tools were used for Mr. Crabb's trade and were exempt from Chapter 13 bankruptcy filings.  State Farm did pay $2,168.75 on September 13, 2001 for Mr. Crabb's theft claim, although the Crabbs assert that this payment does not represent that the claim was settled for this amount.

These bankruptcy documents do tell a very interesting story, however.  In the 1997 bankruptcy filing, the Crabbs listed the value of their personal property as only $200 for general clothing, $1,700 for general household goods, and $1000 for wedding bands.[15]  They also listed a combined monthly income of $2,150, with $300 for food expenses and $25 for clothing expenses per month, and $142.91 to be paid towards the bankruptcy plan.[16]  Both of the Crabbs signed these documents under penalty of perjury on July 7, 1997.

Again, in February 1998, the Crabbs filed for bankruptcy protection.  In these documents, the Crabbs listed their personal property value at $455 (excluding two vehicles and a savings and checking account) – including $155 for end tables/lamps, chairs, sofas and a television, $200 for

---

[14]*Id*. Ex. I at 106.

[15]*Id*. Ex. C, at 19-21 (Bankruptcy Filings).

[16]

a washer, dryer, dishes/silverware, a kitchen table and chair, and beds/bedding, and $100 for clothing.  They indicated that their total monthly combined income was $2,604, and included $330 for food expenses, $26 for clothing expenses, and $15 for laundry and dry cleaning expenses per month.  Their projected excess income of $560 a month would be paid towards the bankruptcy plan.  Both Mr. and Mrs. Crabb signed these bankruptcy documents under penalty of perjury on February 26, 1998.

Given all this information, State Farm sent a denial letter to the Crabbs on March 17, 2004.  State Farm indicated it would deny additional benefits allowed under the policy because it appeared that "material misrepresentations were made regarding the extent and value of the claim and the items claimed as destroyed in the fire," and because the Crabbs' unreasonable delay in submitting the personal property inventory forms prevented State Farm from thoroughly investigating and documenting the personal property claim in a timely manner.  State Farm also alleged that the Crabbs had failed to cooperate in the handling of the claim by not providing the requested documentation.

In addition to these disputes regarding the personal property claims, the Crabbs and State Farm also tangled over real property claims.  After the fire, it is undisputed that the Crabbs did not attempt to rebuild their house but rather sold it "as is."  On December 14, 2000, the Crabbs entered into a contract for sale with William Lanier.  This contract required him to make a down payment of $5,000 and other payments over the next twenty-four months.  It also provided that the property would revert back to the Crabbs if Mr. Lanier was more than sixty days delinquent on his payments.  Six days after this sale, Ogden City issued a "Notice of Dangerous Building and Order to Abate," which stated that the house structure was "in an imminent state of

continuous collapse."[17]  Ogden City ordered the owners to "immediately vacate the premises . . .obtain the proper permits as required and secure the building . . . [and] not to lease or rent and to maintain the building . . . vacant and secure against entry until it has been determined that [the] building is[] no longer dangerous by the Ogden City Inspection Division."[18]  It also ordered the Crabbs to "obtain the proper permits and commence to completion, with reasonable diligence, the abatement of [the] building not later than" ten days within receiving Ogden City's notice.[19]  More than two months later, Ogden City issued an order to show cause as to why the home had not been secured, and the Crabbs informed the Inspection Division that they were "selling property on contract [to] William Lanier."[20]

Mr. Lanier appeared at the show cause hearing and indicated that he had purchased the building from the Crabbs.  After months of correspondence between Mr. Lanier and Ogden City, Ogden City finally ordered the home demolished on October 22, 2001.  The demolition and associated costs of $9,191 were attached as a lien to the property.   On April 21, 2004, the Crabbs received the property back through a quit-claim deed executed by Mr. Lanier.  The next day, April 22, 2004, the Crabbs sold the home to Anthony Laub.  Mr. Laub paid the demolition lien as part of the sale.

As part of the Crabbs' insurance policy, the coverage provided for certain claims relating

---

[17]The Crabbs' Memo. in Opp. re. Ordinance and Law Coverage Claims, Docket No. 67, Ex. B, at 3. ("Order to Abate").

[18]*Id*. at 3.

[19]*Id*.

[20]The Crabbs' Memo. in Opp. re. Ordinance and Law Coverage Claims, Docket No. 67, Ex. C, at 1.

to ordinances or laws, as well as to removing debris.  The building-ordinance-or-law provision provided:

> 2. Damaged Portions of Dwelling.
> When the dwelling covered under COVERAGE A - DWELLING is damaged by a Loss Insured we will pay for the increased cost to repair or rebuild the physically damaged portion of the dwelling caused by the enforcement of a building, zoning or land use ordinance or law if the enforcement is directly caused by the same Loss Insured and the requirement is in effect at the time the Loss Insured occurs.[21]

The limitations on these provisions included the proviso that State Farm would "not pay for any increased costs of construction . . . until the dwelling is actually repaired . . . and unless the repairs or replacement[s] are made as soon as reasonably possibly after the loss, not to exceed two years."[22]  State Farm also would not "pay more under this coverage than the amount [the Crabbs] actually spend" either for the increased cost to repair or rebuild the building or to demolish and clear the site of the undamaged portions of the dwelling.[23]

The building-ordinance-or-law provision provided up to 10% of the policy limit on the structure for certain losses.  The specific option that the Crabbs purchased provided for the cost to demolish and clear the site of the undamaged portions of the dwelling caused by the enforcement of a building, zoning, or land use ordinance if the enforcement is directly caused by the same loss insured.  It also limited payments to the depreciated value of the undamaged portion of the dwelling if not repaired or replaced, and to the amount the policyholder actually spends to demolish and clear the site of the undamaged portions of the dwelling caused by the

---

[21]State Farm's Memo. in Support of Sum. Judg. on Law and Ordinance Claims, Docket No. 52, Ex.1 at 24 ("State Farm Policy").

[22]*Id.*

[23]*Id.*

enforcement of building, zoning, or land use ordinance of law.

The debris-removal provision provided:

3. Undamaged Portions of Damaged Dwelling.
When the dwelling covered under COVERAGE A - DWELLING is damaged by a Loss Insured we will also pay for:
a. the cost to demolish and clear the site of the undamaged portions of the dwelling caused by the enforcement of a building, zoning or land use ordinance or law if the enforcement is directly caused by the same Loss Insured and the requirement is in effect at the time the Loss Insured occurs.[24]

Accordingly, State Farm would "pay the reasonable expenses [the Crabbs] incur in the removal of debris of covered property damaged by a Loss Insured."[25]  It also provided that when property damage loss and debris removal costs exceed the policy limits, an additional 5% of the limit is available as a debris removal expense.[26]

The current suit resulted when State Farm declined to pay additional monies for personal property claims, ordinance or law coverage, debris removal, or any other costs associated with the real property.  The Crabbs alleged breach of contract and breach of the covenant of good faith and fair dealing by State Farm, among other claims.

## DISCUSSION

*A. Standard of Review*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

---

[24]*Id.*

[25]*Id*. at 5.

[26]*Id*.

of law."[27]   The court must view the evidence, and draw reasonable inferences from that evidence,

in the light most favorable to the nonmoving party, which is the Crabb family.[28]   The Crabbs may

not, however, "rest on mere allegations or denials of [their] pleading, but must set forth specific

facts showing there is a genuine issue for trial."[29]

> *B. Ordinance or Law Coverage*

The Crabbs allege that a breach of contract by State Farm resulted in costs of at least

$13,461 in demolition and debris removal costs and $26,020 in code upgrades.  Specifically, they

argue that State Farm owes them money under the both the building-ordinance-or-law provision

and the debris-removal provision of their State Farm policy.  They also provide a sworn affidavit

by Nathanael Cook, their adjuster, in regards to these claims.

State Farm has moved for summary judgment on these claims, arguing that the Crabbs

never incurred costs for code upgrades or demolition and debris removal, and that this claim

should be dismissed as a matter of law.  The Crabbs counter that they had to sell their house and

land to a third party "as is," and that they incurred certain costs in the sale and the

demolition/debris removal.  The Crabbs also assert that their policy includes a liberalization

clause, which makes any revisions adopted by State Farm which would broaden coverage under

this policy to immediately apply to the policy.[30]   Through the affidavit of Nathanael Cook, the

---

[27]Fed. R. Civ. P. Rule 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Cummings v. Norton*, 393 F.3d 1186, 1189 (10th Cir. 2005).

[28]*Cummings*, 393 F.3d at 1189; *Spaulding v. United States*, 279 F.3d 901, 904 (10th Cir. 2002).

[29]*Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).

[30]*Id.* at 19.

Crabbs argue that the State Farm policy had an additional endorsement added to it which clearly makes State Farm liable for the Crabbs' incurred code upgrades and demolition/debris removal costs.

The Crabbs also argue that they have provided evidence that they incurred costs for demolition and debris removal.  They submit an invoice in the amount of $5,186 as a bill for demolition work done on the property as proof of the costs they incurred.[31]  State Farm has submitted evidence showing that the company purporting to do the demolition work was owned by Mr. Lanier, and Mr. Lanier has also submitted an affidavit stating that he prepared the invoice at the Crabbs' request almost a year after he had already purchased the land from the Crabbs.[32]  At the very least, the Crabbs' submitted invoice is of dubious positive proof, but the court will take the evidence in the light most favorable to them and assume the invoice is valid.

Another issue with the invoice immediately arises, however.  Mr. Lanier bought the property on contract from the Crabbs beginning on December 14, 2000.  The bill for "demolition work done on property" is dated for November 10, 2001, almost a year after the property had been sold on contract to Mr. Lanier.  Ogden City had already ordered the building to be demolished on October 22, 2001 and placed a lien on any sale of the house for the amount of the demolition.  What is confusing is that Ogden City demolished the property and put a lien on its further sale, but the Crabbs also provide an invoice for "demolition work done on the property" dated *after* Ogden City had demolished the building.  And the invoice was submitted from the

---

[31]The Crabbs' Memo. in Opp. re. Ordinance and Law Coverage Claims, Docket No. 67, Ex. M.

[32]State Farm's Reply Memo. re. Ordinance and Law Coverage Claims, Docket No. 73, Ex. 7, at 3-5 ("Lanier Affidavit").

person who was actually in the middle of buying the property from the Crabbs in the first place.

Apart from these difficulties, however, an even more fundamental problem with the

Crabb's claim on the additional endorsement is that it necessarily relies on Mr. Cook's affidavit.

State Farm has moved the court both to strike the affidavit and to preclude Mr. Cook from

testifying at trial on grounds that he has not been properly disclosed as an expert witness.

Governing law on this issue comes from Fed. R. Civ. P. Rule 26(a)(2), which describes the

requirements for disclosure via an expert report:

> Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is *retained or specially employed* to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness.  The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness had testified as an expert at trial or by deposition within the preceding four years.[33]

The Crabbs argue that Mr. Cook is neither "retained" nor "specially-employed" to provide expert

testimony in the case, but rather someone who they simply hired to help with their insurance

claim.  As a result, in their view, he does not fall within the requirements of Rule 26(a).  State

Farm counters that Mr. Cook is being used as an expert witness.  Indeed, Mr. Cook has already

offered his personal knowledge "as a licensed insurance adjuster in the State of Utah" and offers

insights as "a result of [his] training and experience."[34]  He also states that as a result of his

---

[33]Fed. R. Civ. P. Rule 26(a)(2) (emphasis added).

[34]The Crabbs' Memo. in Opp. re. Ordinance and Law Coverage Claims, Docket No. 67, Ex. A, at 2 ("Nathanael Cook Affidavit").

years of experience as a public insurance adjuster, he had "gained knowledge and expertise" regarding certain issues over valuation.[35]  Additionally, he offers his "opinion" regarding the value of the remaining structure on the Crabbs' lot after the fire.[36]  By the court's count, the terms "expertise," "experience," "training," "knowledge" and "opinion" in various forms grace Mr. Cook's three-page affidavit at least eight times.

The court agrees with State Farm that Mr. Cook is an expert witness.  Given Mr. Cook's self-professed specialized knowledge and expertise regarding insurance policies, construction valuations, and insurance claims, he is not some kind of "fact" witness (at least on the subjects germane to this motion) but rather the very sort of witness from whom expert reports are required.  Moreover, while the Crabbs argue that Mr. Cook was disclosed as a "potential" expert, it is quite clear that Mr. Cook has not provided the necessary Rule 26(a) expert report to State Farm – a report that was due months ago.  This not only unfairly disadvantages State Farm, but also make it difficult for the court to discharge its "*Daubert* gatekeeping" functions[37] to insure that expert opinions are reliable.

In view of the Crabbs' failure to provide the necessary expert report, the question then arises as what is the proper remedy for that failure.  State Farm strenuously argues that the proper remedy is to bar him from testifying or present evidence in an expert capacity.  Having carefully

---

[35]*Id.*

[36]*Id.*

[37]*See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999) ("Neither is the evidentiary rationale that underlay the Court's basic *Daubert* 'gatekeeping' determination limited to 'scientific' knowledge." (citing *Daubert v. Merrill Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993)); *Norris v. Barter Healthcare Corp.*, 397 F.3d 878, 883 (10th Cir. 2005).

considered the various options, the court agrees.  The court gave the Crabbs ample opportunity to

file an expert report for Mr. Cook, which they never did.  At this point, they argue that Mr. Cook

is not an expert, and have not offered to provide an expert report for Mr. Cook to supplement his

deficiencies.  The decision to strike an expert witness is a "drastic sanction," and the court must

consider four factors:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses
> would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to
> which waiver of the rule against calling unlisted witnesses would disrupt the orderly and
> efficient trial of the case or of other cases in court, and (4) bad faith or willfulness in
> failing to comply with the court's order.[38]

The Crabbs have not sought to amend their pleadings to treat Mr. Cook as an expert and

provide a Rule 26(a)(2) expert report.  Nor have they offered any explanation about how to cure

the prejudice against State Farm for failure to provide the required expert report.  The prejudice

to State Farm could possibly be cured by nonetheless allowing a belated expert report followed

by a deposition of Mr. Cook (and possibly additional expert reports from the defense and a new

round of discovery for the plaintiffs), but the court has given ample time for development of this

case already.  Trial had already been set once for March 27, 2006, and canceled once already, so

further time to allow for an expert report and depositions that should have been conducted long

ago would require some significant rescheduling of this case.  On the other hand, the court finds

that the Crabbs have declined to submit Mr. Cook's expert report based not for some malicious

reason but because of  their arguments regarding proper interpretation of the rules.  The Crabbs

position is meritless – extremely so when the Crabbs curiously argue that it was State Farm's

---

[38]*Summer v. Missouri Pac. R.R. Sys.*, 132 F.3d 599, 604 (10th Cir. 1997) (internal
citations omitted).

burden to "make an[] effort to obtain a Rule 26(a)(2)(B) expert report regarding Mr. Cook's opinions." Yet there is a difference between a completely meritless position and a bad faith position. The court cannot find that the Crabbs acted in bad faith. Finally, State Farm has submitted a certified copy of the policy which does not include the FE-5273 endorsement that Mr. Cook alleges is part of the policy. Weighing all these factors, the court concludes that a further extension of time for additional submissions by the Crabbs on their expert is not appropriate and, instead, the appropriate sanction is exclusion of Mr. Cook as an expert is proper.

With respect to the law-or-ordinance coverage and the debris-removal coverage, the certified policy submitted by State Farm does not include the endorsement which allows the Crabbs to argue for their requested costs. The Crabbs have never objected to the certified copy of their policy submitted by State Farm, and this certified copy does not include Endorsement FE 5273 – the endorsement that the Crabbs and Mr. Cook claim was added to their policy.

Given that Mr. Cook's affidavit is not before the court, and given that the certified copy of the Crabbs' policy does not include Endorsement FE 5273, the Crabbs cannot argue that State Farm should provide further funds based on this plain wording of the policy. The Crabbs do provide the lone invoice, of dubious nature, but assumed to be factually correct for the purposes of this motion. The invoice states only payment for "demolition work done on property" and does not present a date when the work occurred, what type of work occurred, or whether the work occurred due to the Loss Insured. The Crabbs submit this invoice as part of their claim for demolition work, but then claim that "there was about $5,000 worth of debris removal."[39]

---

[39]State Farm's Reply to the Crabbs' Response, Docket No. 73, Ex. 5, at (Nov. 14, 2005) (Debra Crabb Deposition).

Submitting an invoice for "demolition work done on property" and then claiming that it was for "debris removal" is at odds with the plain wording of the documents, and the court finds that this invoice does not provide enough to survive summary judgment on this point.

Absent the invoice of dubious nature, the Crabbs have not shown that they actually expended any funds to either repair or rebuild their structure or to demolish their structure. The court GRANTS State Farm's motion for partial summary judgment regarding the Crabbs' claim for ordinance or law coverage (#52).

C. Punitive Damages

In their complaint, the Crabbs alleged five causes of action: breach of contract, bad faith, intentional infliction of emotional distress, tortious violation of public policy, and defamation. They also sought punitive damages. The court previously dismissed the Crabbs' claims for tortious violation of public policy, defamation, and intentional infliction of emotional distress, leaving only the breach of contract and bad faith claims.[40] In light of these dismissals, State Farm now argues that, because the only remaining claims are contract claims, summary judgment must be granted as to any punitive damages claim. According to State Farm, Utah law forbids punitive damages absent an independent tort claim. The Crabbs counter that "with respect to first-party bad faith insurance claims, the latest indication from Utah courts is that punitive damages are, in fact, available for such claims."[41]

---

[40]See Order Granting Partial Summary Judgment on the Crabbs' Intentional Infliction of Emotional Distress Claim, Docket No. 60 (D. Utah Oct. 6, 2005); Order Granting Defendant's Motion to Dismiss the Crabbs' Defamation and Tortious Violation of Public Policy Claims, Docket No. 15 (D. Utah Oct. 5, 2004).

[41]The Crabbs' Memo. in Opp. to Mot. to Dismiss Punitive Damages Claim, Docket No. 68, at 1-2 (D. Utah Oct. 7, 2005).

State Farm relies on *Beck v. Farmers Insurance Exchange*,[42] in which the Utah Supreme Court held that a first-party insurance claim against an insurance carrier based on a breach of the implied covenant of good faith and fair dealing gave rise to a claim for breach of contract, not an action in tort.[43]  *Beck* clearly analyzed the distinction between applying contract and tort analysis to first-party bad faith insurance claims, declaring that "the tort approach adopted by [other] courts is without sound theoretical foundation and has the potential for distorting well-established principles of contract law."[44]  *Beck* also noted that in the earlier decision of *Lyon v. Hartford Accident Indemnity Company*, "a tort cause of action did not arise in a first-party insurance contract situation because the relationship between the insurer and the insured is fundamentally different than in a third-party context."[45]

*Beck* therefore held "that in a first-party relationship between an insurer and its insured, the duties and obligations of the parties are contractual rather than fiduciary.  Without more, a breach of those implied or express duties can give rise only to a cause of action in contract, not one in tort."[46]  And the "general rule is that punitive damages cannot be awarded for a breach of

---

[42]701 P.2d 795 (Utah 1985).

[43]*Id.* at 798; *see also Black v. Allstate Insurance Co.*, 100 P.3d 1163, 1170 (Utah 2004) (explaining in the context of a third-party insurance claim that an insured has cause of action in tort against insurer only where insurer undertakes and breaches fiduciary duty to defend insured against lawsuit by a third party claimant).

[44]701 P.2d at 799.

[45]*Id.* (quoting 480 P.2d 739, 745 (Utah 1971)).

[46]*Beck*, 701 P.2d at 800.

contract."[47]  So if *Beck* continues to be good law, then the Crabbs' punitive damages claim must be dismissed because punitive damages are unavailable for breach of contract actions.

The Crabbs cite to one Utah state cases for the proposition that punitive damages should be available for a first party bad faith insurance claim.  In 1987 in *Gagon v. State Farm Mutual Automobile Insurance Company*,[48] the Utah Court of Appeals overruled a trial court's grant of a directed verdict on a first-party bad faith insurance claim and remanded the case to the trial court. It noted that if "a lack of good faith is found on remand, consideration of punitive damages . . . will be appropriate."[49]  Citing to no other Utah case that deals with a first-party insurance contract claim, the Crabbs argue that "the last word from Utah court on this issue is that, if bad faith if found by a jury in a first-party bad faith insurance claim, consideration of punitive damages is appropriate."[50]

But it is clear that *Beck* is still very much good law in the state of Utah.  In 2002 in *Tucker v. State Farm Mutual Automobile Insurance Company*, the Utah Supreme Court "reaffirmed [the] position in *Beck*," noting that "[a]ll duties and obligations from this first-party contract of insurance are contractual in nature."[51]  In 2004 in *Estate of Berkemeir v. Hartford Insurance Company*, that court explicitly noted that its holding was "consistent with the rule [it]

---

[47]*Jorgensen v. John Clay & Co.*, 660 P.2d 229, 232 (Utah 1984) (citing, inter alia 22 Am. Jur.2d, § 245 ("Damages") (1965) and Restatement of Contracts § 345 (1982)); *see also Norman v. Arnold*, 57 P.3d 997, 1006 (Utah 2002).

[48]746 P.2d 1194, 1197 (Utah Ct. App. 1987), *cert. denied*, 771 P.2d 325 (Utah 1988).

[49]*Id*. at 1197.

[50]The Crabbs' Memo. in Opp., Docket No. 68, at 3-4.

[51]53 P.3d 947, 951-952 (Utah 2002) (quoting *Beck*, 701 P.2d at 800).

announced in [*Beck*] in which [it] held that the duties owed by an insurer to its first-party insured are contractual in nature and that a breach of these duties can give rise only to a cause of action in contract, not one in tort."[52]  Indeed, the Utah Supreme Court expressly held that its holding in *Estate of Berkemeir* was consistent with *Beck*, rather than an alteration of *Beck*'s holding.  And in 2005 in *Machan v. UNUM Life Insurance Company*, the court did not further address punitive damages for first-party insurance claims, specifically noting that it believed "our opinion in *Beck* was firmly grounded in contract principles."[53]  The *Machan* court specifically refused to overturn *Beck*, and stated that it "refused to adopt a tort approach for analyzing such bad faith claims, relying instead on the implied covenant of good faith and fair dealing that inheres in every contract."[54]

Finally, the Utah Supreme Court has already concluded that the implied covenant of good faith and fair dealing as giving rise to a contract claim — rather than a tort claim — because the duty is "'read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose.'"[55] Given Utah state case law, the Crabbs' argument that punitive damages are available for bad faith first-party insurance suits is unpersuasive.

The Crabbs' also argue that Utah's statutory scheme provides for such punitive damages.

---

[52]106 P.3d 700, 703 (Utah 2004) (quotations and citations omitted).

[53]116 P.3d 342, 344 (Utah 2005).

[54]*Id*.

[55]*Peterson v. Browning*, 832 P.2d 1280, 1284 (Utah 1992) (quoting *Foley v. Interactive Data Corp.*, 765 P.2d 373, 394 (Cal. 1988)).

They cite Utah Code Ann. §78-18-1(1)(a), arguing that this statute does not preclude an award of punitive damages here because it simply limits such an award to situations of "willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of the rights of others."[56]  The Crabbs, however, neglect to include an important word in their recitation of this statute.  Utah Code Annotated § 78-18-1 specifically states that punitive damages "may be awarded only if . . . it is established by clear and convincing evidence that the acts or omissions of the *tortfeasor*" result in the complained conduct.  Because § 78-18-1 specifically refers to a "tortfeasor" in its language, it is clear a tort is a prerequisite to punitive damages.  And as previously discussed, first party insurance contract suits over the implied covenant of good faith and fair dealing give rise to contract claims under Utah state law – not tort claims.

For all these reasons, the court GRANTS State Farm's motion to dismiss the Crabbs' punitive damages claim.

### D. Breach of Implied Covenant of Good Faith and Fair Dealing

The Crabbs' complaint also raises a claim that State Farm breached the implied covenant of good faith and fair dealing by failing to pay their further claims for either their house or their personal property.  State Farm responds that it paid the policy limits for the damaged portions of the house up to the coverage's limit and that the Crabbs' other claims were "fairly debatable" as a matter of law – precluding a finding of bad faith.

Regarding the payment of "replacement cost" for the Crabbs' home, the Crabbs rely on the Nathanael Cook affidavit to show that State Farm had adopted Endorsement FE-5273.

---

[56]The Crabbs' Memo. in Opp., Docket No. 68, at 3 (quoting UT CODE ANN. §78-18-1).

Endorsement FE-5273 provides that State Farm would pay the reasonable and necessary cost to repair or replace the home, rather than pay only the actual cash value of the home until repair or replacement is completed.  Given that the court has already struck Mr. Cook's Affidavit, and given that the certified copy of the policy does not include Endorsement FE-5273, the Crabbs can show no support for their assertion that Endorsement FE-5273 applied to their policy.  State Farm was therefore only required to pay the replacement cost of the home once actual repair or replacement was completed.  Because it is undisputed that the Crabbs never repaired, rebuilt, or replaced their home in accordance with the State Farm policy, they were only entitled to the actual cash value of the home.  As a matter of law, then, State Farm could not have breached the contract, or breached the covenant of good faith and fair dealing, by not paying the replacement cost of the Crabbs' home.

With respect to the Crabbs' personal property claims, State Farm argues that the undisputed facts demonstrate that it acted in good faith and that it diligently investigated the facts to determine the validity of these claims.  This investigation, it argues, revealed considerable reasons to doubt the validity of the Crabbs' claims.  State Farm cites to the Crabbs' inability or unwillingness to provide documentation or substantiating information, as well as the Crabbs' contradictory representations regarding ownership and value of requested items.  State Farm asserts that all of the facts given above, taken in the light most favorable to the Crabbs, show that the Crabbs' claim were "fairly debatable" as a matter of law – requiring summary judgment on the bad faith claims under Utah case law.  State Farm cites *Prince v. Bear River Mut. Ins. Co.*, which held that under "Utah law, if an insurer denies an insured's claim [that] is fairly debatable, [then the insurer] is entitled to debate it and cannot be held to have breached the implied

covenant if it chooses to do so."[57]  State Farm also recites a number of questions it had regarding the Crabbs' personal property coverage and requests.

It is clear from the undisputed facts that State Farm was diligently investigating the Crabb's claims, by requesting more information from the Crabbs (which they neglected to provide in full) and by investigating the Crabbs' bankruptcy filings.  This diligent investigation appeared to paint a dramatically different picture of the value of the Crabb's personal property. Additionally, State Farm requested more information from the Crabbs regarding their theft claims because of the discrepancy in the reported value of certain stolen items reported to the police.  And the Crabbs continually failed to provide the documentation or inventories requested in a timely manner.

In light of these facts, no reasonable jury could reach any other conclusion than that State Farm was properly investigating fairly debatable claims.  Of particular note is the dramatic increase in the number and value of the Crabbs' submitted personal property claims.  The only explanation offered by the Crabbs is that the value listed for their personal property in the bankruptcy filing was based on the "liquidation value" as of 1998, while the values listed in their personal property inventory was based on the "replacement cost" of the Crabbs' property as of 2000.  This claim is, to put it charitably, far fetched.  In 1998, the Crabbs owned $455 of personal property when they filed for bankruptcy and signed documents in United States Bankruptcy Court.  And in 2000, less than two years later, the Crabbs allegedly owned over $195,000 of personal property, on a salary that provided a discretionary income of $26 a month for clothes and $330 a month for food while paying off creditors at $560 a month.  Such

---

[57]56 P.3d 524, 533 (Utah 2002).

assertions by an insured would undoubtedly raise the eyebrows of any insurance company when processing a claim.

In sum, it is overwhelmingly clear that State Farm's desire to further question the Crabbs regarding their personal property claim was reasonable and justified, and that at this point the Crabbs' claim was certainly in the realm of "fairly debatable." State Farm's investigation appears to the court to be a diligent search for documentation for personal property loss which the Crabbs failed to provide to State Farm. Indeed, the Crabbs failed numerous times to provide the required requested documentation, failed to document their personal property requests sufficiently, and possibly inflated their personal property requests over time. And despite numerous requests by State Farm, the Crabbs have yet to provide State Farm with positive proof of ownership of a myriad of items.

Upon receiving all of the documentation provided by both sides, the court itself wonders itself about the validity of the Crabbs' personal property claims. But the only question here is whether, taking the facts in the light most favorable to the Crabbs, State Farm diligently investigated a fairly debatable claim.[58] The court agrees with State Farm that it did. Accordingly, the court GRANTS State Farm's motion for summary judgment on the Crabbs' claim of breach of implied covenant of good faith and fair dealing.

### F. Collateral Estoppel and Material Misrepresentation

The last claim remaining before the court is the Crabbs' breach of contract claim. State Farm seeks summary judgment on this claim as well, contending that the Crabbs should be

---

[58]*Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 465 (Utah 1996) (quotations omitted); *see also Prince*, 56 P.3d at 533; *Beck v. Farmers Ins. Exchange*, 701 P.2d 795, 801 (Utah 1985).

estopped from arguing they had a different value of their personal property based on their statements made in their bankruptcy proceedings.  State Farm further argues that material misrepresentations resulted in the Crabbs breaching their contract with State Farm.  Specifically, State Farm argues that the Crabbs made material misrepresentations to it and therefore breached their contract.  The Crabbs therefore have no cause of action against State Farm for their breach, as the argument goes, especially since the policy included a material misrepresentation clause:  if the Crabbs "under [the] policy . . . intentionally concealed or misrepresented any material fact or circumstance relating to this insurance," the policy was void and the Crabbs have no cause of action against State Farm.[59]

The court finds that no reasonably jury could reach any other conclusion than that the Crabbs made several material misrepresentations, thereby breaching the contract with State Farm.  First, the Crabbs falsely represented to State Farm that they had not filed for bankruptcy in the prior thirty years when asked by State Farm.[60]  Mr. Crabb initially stated he had not been involved in a bankruptcy proceeding in the past thirty years, and later admitted that he intentionally answered this question wrong to State Farm.

Additionally, the undisputed facts demonstrate that the Crabbs so substantial inflated the value of their Crabbs personal property that a material misrepresentation exists as a matter of law.  In 1998, the Crabbs represented to the federal bankruptcy court under oath that they possessed personal property with a liquidation value of $455; yet, less than two years later, they

---

[59]State Farm Policy at 13.

[60]State Farm's Motion for Sum. Judg. on Collateral Estoppel and Material Misrepresentation, Docket No. 77, Ex. I, at 149 (Nov. 15, 2005) (Deposition of Elmer Crabb).

represented to State Farm that they possessed personal property with a "replacement cost value" of over $74,000.  They managed this feat with a discretionary income of $26 a month for clothes and $330 for food expenses, as represented to the federal bankruptcy court.  And soon thereafter they represented to State Farm that they had personal property with a "replacement cost value" of over $195,000.  It is clear there are major discrepancies in these statements, either to the federal bankruptcy court in 1998, or to State Farm and this court now.

The issue the court is faced with at this juncture is whether a material misrepresentation was actually made to State Farm regarding inflated personal property values.  The Crabbs might argue on this point that, while they might have led the bankruptcy court astray with their filings, the statements made to State Farm are true and correct and therefore not material misrepresentation.  But "[the] policy [is void if the Crabbs'] . . . intentionally concealed or misrepresented any material fact or circumstance relating to this insurance."[61]  State Farm specifically asked Mr. Crabb if they had filed for bankruptcy recently, and the Crabbs failed to relate the material circumstance of their recent bankruptcy filings to State Farm.  State Farm therefore had to expend large amounts of time and energy to discover and analyze the Crabbs' 1997 and 1998 bankruptcy documents, which should have been disclosed as a material circumstance that was concealed by the Crabbs relating to their insurance policy.  So, whether the Crabbs were lying to the bankruptcy court, or to State Farm, or to both, they concealed the material circumstance of their bankruptcy filings that was relevant to their insurance policy.

The record suggests that the Crabbs made well have made additional material misrepresentations, but the ones noted here are sufficient to show a breach of contract by the

---

[61]State Farm Policy at 13.

Crabbs.  The plain language of the contract clearly stated that it was void if the Crabbs intentionally concealed or misrepresented any material fact or circumstance that related to their insurance.  The undisputed facts show that the Crabbs breached their insurance contract with State Farm.[62]  Accordingly, the court GRANTS State Farm's motion for summary judgment on the breach of contract claim.

Additionally, in light of the questions that have arisen about the statements made by the Crabbs to the bankruptcy court, the court believes that it is appropriate to send a copy of this order to the U.S. Attorney's Office for its review of possible criminal violations in the bankruptcy process by the Crabbs.  Any objection to such action should be filed by the Crabbs within ten days.

## CONCLUSION

The court GRANTS State Farm's motion to exclude Nathanael Cook and motion to strike the affidavit of Mr. Cook filed by the Crabbs (#70), GRANTS State Farm's motion for partial summary judgment regarding the Crabbs' claim for ordinance or law coverage (#52), GRANTS State Farm's motion to dismiss the Crabbs' punitive damages claims (#62), DENIES AS MOOT State Farm's motion for extension of time regarding the settlement conference deadline (#71), GRANTS State Farm's motion for partial summary judgment regarding the Crabbs' claim of breach of implied covenant of good faith and fair dealing (#76), and GRANTS State Farm's motion for summary judgment regarding collateral estoppel and material misrepresentation (#75).  The court also DENIES AS MOOT State Farm's objection to the Crabbs' Notice of

---

[62]*See Wagon v. State Farm & Cas. Co.*, 146 F.3d 764, 768, 770 (10th Cir. 1998); *Long v. Insurance Co. of North Am.*, 670 F.2d 930, 934 (10th Cir. 1982).

Compliance (#93).  Since the Crabbs' claims have all been dismissed, the court orders the

Clerk's Office to close this case.

SO ORDERED.

DATED this 21st day of April, 2006.

BY THE COURT

_____

Judge Paul G. Cassell
United States District Court